J-A02029-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| C.M.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| K.D.M. | : | No. 1255 WDA 2017 |

Appeal from the Order July 31, 2017
In the Court of Common Pleas of Erie County Civil Division at No(s):  No.
10908-2017

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

DISSENTING MEMORANDUM BY BOWES, J.:      FILED AUGUST 06, 2018

I respectfully dissent.  Unlike my esteemed colleagues, I believe that the trial court misconstrued the facts adduced during the custody hearing in rendering its decision to award the parties shared legal and physical custody of their two-year-old daughter, C.K.  Specifically, the trial court's best-interests analysis ignored Mother's prior interference with the father-daughter relationship, minimized the risk of harm associated with Mother's ex-husband, dismissed Mother's stated inability to provide for C.K.'s basic needs as "exaggeration[s]," and rationalized her prior mental health problems as the consequence of prior "family and financial situation[s]."  Trial Court Opinion, at 3-7.

C.K. was born during 2015 of the relationship between Mother and Father, who never married.  For approximately two years, the family, including

two of Mother's other four children, resided together in Father's home. During this period, Father shared the responsibility of satisfying C.K.'s daily needs. The relationship between Mother and Father eventually deteriorated, and on March 27, 2017, while Mother and C.K. still resided in the family home, Father filed a complaint for custody seeking primary physical custody of his daughter. Mother countered by moving from the home with C.K. and her half-siblings. For the ensuing three weeks, Mother refused to disclose where she and C.K. lived. In addition, once Mother resurfaced, she mandated that Father contact her only through Facebook Messenger. In contrast, Mother would call Father from a telephone with an Ohio area code. For the two months preceding the custody hearing, the parties shared physical custody of C.K. under an informal arrangement.

Mother and Father both testified during the custody hearing, and Father presented several exhibits documenting his written exchanges with Mother following their separation. After the close of evidence, the trial court took the matter under advisement, and on July 31, 2017, it entered a final custody order awarding the parties shared legal and physical custody of C.K. This timely appeal followed.

In fashioning the shared custody order, the trial court reviewed the relevant custody factors outlined in 23 Pa.C.S. § 5328(a), fifteen of which it

determined were either neutral or inapplicable.[1]  The court found that Mother

and Father were favored by one factor each.  Specifically, the court

_____

[1] Section 5328(a) provides an enumerated list of factors a trial court must consider in determining the best interests of a child:

§ 5328.  Factors to consider when awarding custody.

(a)  Factors. – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

determined that subsection (a)(2), regarding the continued risk of physical harm, militated in favor of Father, and subsection (a)(12), concerning a parent's availability to care for the child, favored Mother.

_____

> (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.
>
> (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.
>
> (10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.
>
> (11) The proximity of the residences of the parties.
>
> (12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.
>
> (13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.
>
> (14) The history of drug or alcohol abuse of a party or member of a party's household.
>
> (15) The mental and physical condition of a party or member of a party's household.
>
> (16) Any other relevant factor.

23 Pa.C.S. § 5328(a). The custody court found eleven factors neutral and four inapplicable.

In light of the apparent stalemate, the trial court concluded, "[p]rimarily because of the benefits to [C.K.] of maintaining stability and continuity in her family relationships, . . . it is in the child's best interests to award both parents equal shared custody." Trial Court Opinion, 7/31/17, at 7. Hence, the court elected to maintain the status quo and order shared physical custody.

While our standard of review is highly deferential to the custody court's factual findings and credibility determinations, it is beyond peradventure that the certified record must support the court's determination.[2] See J.R.M. v. J.E.A., 33 A.3d 647, 650 (Pa.Super. 2011). Instantly, Father asserts that the trial court abused its discretion or committed an error of law with respect to its consideration of, inter alia, § 5328(a)(1), (3), (4), (10), and (15), all of which the court determined did not militate in favor of either party. While the majority rejects Father's contentions out of deference to the trial court's role as the ultimate arbiter of fact, as I highlight infra, the certified record will not sustain the trial court's characterization of the above-referenced factors as neutral. Thus, in contrast to the majority, I would hold that several of the §

_____

[2] Footnotes 4, 5, and 6, of the Majority Memorandum complain that I impermissibly reweigh the evidence and/or engage in credibility determinations. I observe, however, that the trial court's assessment of fact is entitled to the deference warranted by the evidence adduced at trial. Stated another way, if the record does not support the trial court's finding of fact, we are not obliged to adopt it. As I explain at length in the body of my dissent, the essence of my perspective is that the certified record simply does not sustain all of the trial court's factual findings and credibility determinations that the majority is committed to uphold.

5328(a) factors that the court deemed neutral actually weigh in favor of awarding primary physical custody to Father.

As it relates to subsection (a)(1), and by extension subsection (a)(8), the record confirms that Mother actively interfered with Father's ability to maintain contact with his daughter. During the evidentiary hearing, Father described how, approximately three months prior to the custody hearing, Mother prevented him from seeing his daughter for three weeks. N.T., 7/25/17, at 21-22, 26. During that period, Mother was evasive about their location, and she would only permit Father to communicate with her through Facebook. Id. at 23, 26. Likewise, she typically filtered her communications with Father through the telephone of a then-unknown intermediary. Id. The trial court did not specifically address this aspect of Mother's behavior in its best-interests analysis, and the majority attempts to diminish the import of Mother's obdurate conduct by noting that she has not obstructed Father recently. In my view, the trial court abused its discretion in neglecting to consider the undisputed evidence regarding Mother's intentional interference with Father's ability to communicate with C.K. as recently as approximately two months prior to the custody hearing, and in failing to weigh the relevant considerations under subsections (a)(1)[3] and (8), in his favor.

_____

[3] Notwithstanding the majority's protestations to the contrary, I did not misinterpret the best interest factor outlined in § 5328(a)(1), relating to a parent's likeliness to "encourage and permit frequent and continuing contact

The record also reveals that the custody court understated the significance of the recent physical abuse that Mother and C.K.'s fourteen-year-old half-brother recently endured at the hands of Mother's ex-husband, against whom she obtained a protection from abuse ("PFA") order in 2012. Id. at 64-65. Although the court stated that it weighed this consideration in Father's favor, as a factor that affects C.K.'s safety, it should have been afforded the statutorily-mandated "weighted consideration," which I do not believe is subject to offset by the court's consideration of Mother's availability to care for the child under subsection (a)(12). See 23 Pa.C.S. § 5328(a); M.J.M. v. M.L.G., 63 A.3d 331, 338 (Pa.Super.2013) ("The language of this statute is clear. It explicitly provides that all relevant factors shall be considered by the trial court, and the only factors that should be given 'weighted consideration' are factors that 'affect the safety of the child.'").

It is disconcerting that, notwithstanding her past victimization, Mother implied that she was partially at fault for the incident. She testified, "I should not have gone to [the ex-husband's] home, but it was all right. He became

_____

between the child and another party." Respectfully, and with deference to my learned colleagues, I cannot discern how my consideration of Mother's interference with Father's ability to contact his daughter was a misapprehension of a factor that is specifically designed to determine which parent is more likely to encourage contact. Moreover, after characterizing my analysis as not "forward looking," the majority engaged in a similar consideration of Mother's past behavior. Majority Memorandum at 6. It merely chose a period of cooperation that cast Mother in a favorable light. Id. at 6-7. Both inquiries scrutinized Mother's prior conduct as a barometer of her expected future behavior.

enraged and tried to strangle my son." N.T., 7/25/17, at 64. Then, after explaining how the ex-husband could not present a risk of harm to C.K. because he is never around the child, she testified that, a few months prior to the latest assault, she took all of her children, including C.K., to the ex-husband's home to hunt for Easter eggs. Id. at 65. Likewise, for reasons unknown, prior to moving from Father's residence, Mother provided her ex-husband the access code to Father's home. Id. at 81. She made both of these decisions despite having previously obtained the PFA order against her abuser. Rather than complying with its statutory mandate and acknowledging that Mother's unsound decisions placed C.K. at risk of physical harm, the trial court reasoned that Mother's role as the primary caretaker neutralized the safety considerations against her. In my view, equating these considerations constitutes reversible error. See M.J.M., supra at 339 (Legislature required trial court to give additional weight to child safety, but not party's role as primary caretaker).

In addition, I disagree with the majority's position that consideration of the most recent episode, which occurred two weeks before the custody hearing, is tantamount to shifting to Mother responsibility for the acts of her ex-husband. Id. at 76. I cannot accept the majority's rationale that, since Mother does not encourage the interactions with her ex-husband, the factor should not militate against her. Whether or not Mother encourages the abuse is not directly relevant to the potential for harm. To the contrary, the abuse

Mother suffered is germane to the risk of harm that the ex-husband presents to C.K. and Mother's ability, or inability as the case appears to be, to provide adequate physical safeguards as discussed in subsection (a)(2). It is also germane to her ability to maintain stability in her family life under subsection (a)(4). Stated plainly, contrary to the majority's characterization of the issue, it is not Mother's status as victim of domestic violence, but her inability to protect C.K. from harm, that is the dispositive consideration under the relevant statutory factors. Mother is responsible for C.K.'s safety, and if her ex-husband presents a danger to the child, that factor undoubtedly militates against her. The record demonstrates that the ex-husband's presence is a direct threat to C.K.'s welfare.

Next, I outline the evidence that demonstrates how Mother's financial situation prevents her from meeting the needs of the child. These considerations implicate the factors highlighted in subsections (a)(3) and (10). The majority accurately characterized the shifting relevancy of the parties' relative incomes under our decision in Roadcap v. Roadcap, 778 A.2d 687 (Pa.Super. 2001). Stated plainly, a parent's financial situation is immaterial unless his or her income is so inadequate that it prevents the child from being raised in a "decent manner." Id. at 690.

While the trial court concluded that Mother was capable of providing for their daughter's basic needs, the record bears out that Mother persistently hounded Father about her children going without necessities and C.K. crying

because Mother did not have food and milk. Mother has been collecting unemployment benefits since she quit her job during March 2017. N.T., 7/25/17, at 12. In the two weeks preceding the July 2017 custody hearing, she sent Father a series of text messages complaining that C.K. was hungry and that she did not have money for food, supplies, clothes or gasoline for her automobile. Id. at 13-16; Father's Exhibit A at 4-9. Specifically, on Friday, July 14, 2017, Mother dismissed Father's inquiry regarding a custody transfer, "I don't care[,] but I have no milk, no gas and 75 cents until next Wednesday." N.T., 7/25/17, at 13-14. The next morning, she berated, "Are you bringing milk, [C.K.'s] been screaming all night because we only had Kool-Aid and that's gone now." Id. at 14. She reiterated, "I said we have no milk and no money. [C.K.'s] been drinking Tang since yesterday morning[.] I asked you for milk [two] days ago and last weekend." Id.; Father's Exhibit A at 5. Hours later, still appalled with what she viewed as Father's apathy to her plight, Mother responded to another custody-related missive from Father as follows:

> Yes[,] . . . anything to make you happy. I'm sick of hearing these children cry about not having food [or] drinks . . . and [C.K.] is included[.] You . . . should be ashamed of your[self]. And you['re] the one I call the good father but your daughter's been crying for milk for days. . . . I've asked you for milk for over a week. I've no job and no money. . . . I asked you for a few bucks to borrow for gas. I ran out of gas in Conneaut [and] your daughter sat in a hot car for an hour.

Father's Exhibit A at 6. After Father informed Mother that he could provide C.K. the milk, food, and supplies that she needed, Mother responded, "Jesus Christ[!] [W]hy don't you then when I ask you for stuff. Wtf. My kids go

without food[.]" Id. The following Monday, Mother renewed her request for assistance. "Can you bring milk and juice for her tomorrow and a pack of [w]ipes. I ran into Mike Golmer and he gave me money to buy the kids food so there is something for her to eat here." Id. at 7.

During the evidentiary hearing, Father confirmed that it was not unusual for Mother to request assistance for money, milk, and supplies for C.K. Indeed, he verified that Mother's statements in the foregoing communications are typical representations of her inability to satisfy their daughter's needs. N.T., 7/25/17, at 15.

The trial court dismissed Mother's pleas for relief as an exaggeration designed to bring about Father's cooperation and, apparently ignoring the assistance of a third-party to feed the children, the court concluded that Mother was able to provide for the children. In this vein, Mother denied having trouble obtaining necessities, but she acknowledged that she hounded Father in the above-cited text messages. Id. at 68. She explained, "I don't see it as an issue to ask the father of the child to bring some milk or some type of food." Id. Later, she deflected, "I was trying to make him feel like an ass because he hadn't shown up with the milk that I asked him for . . . three weeks [earlier.]" Id. at 72.

The majority refers to Mother's explanations in concluding that the certified record supports the trial court's decision that both parents can provide for C.K.'s basic needs. While our standard of review accords special

deference to the fact-finder's credibility determination, the court's interpretation must be consistent with the evidence. As this Court stated, "[u]ltimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record." J.R.M., supra at 650 (citation omitted).

The trial court's account of the evidence is not plausible in light of the entire record. In this regard, I highlight that Mother not only beseeched Father for assistance in providing C.K. and her half-siblings basic necessities, she made similar entreaties to a third-party, Mike Golmer, who gave Mother money to purchase food for the children. Thus, contrary to the trial court's characterization, Mother's statements regarding her financial predicament are more than mere hyperbole. Indeed, in actuality, Mother's repeated pleas for assistance are competent evidence that Mother cannot provide C.K. with basic necessities without outside support. While our jurisprudence typically does not permit a comparative review of the parties' respective economic means, where, as here, one parent's financial constraints create a substandard living environment, those hardships are relevant. See Roadcap, supra. Hence, I would find that the trial court abused its discretion in disregarding Father's evidence that Mother was incapable of providing for C.K.'s basic needs.

Finally, I dispute the majority's conclusion that the certified record supports the trial court's finding that Mother's mental health issues do not adversely affect her parenting ability. Mother's mental health is relevant

under § 5328(a)(15), and it also implicates the court's considerations under subsections (a)(4) and (a)(10).

Mother suffers from anxiety and she takes prescribed anti-anxiety medications as needed. N.T., 7/25/17, at 56. During the evidentiary hearing, Father recounted Mother's mental health problems, which ultimately led to the dissolution of the relationship. Father testified that Mother would stay awake for three days at a time and that she consumed Adderall, for which she has a prescription. Id. at 17. In one incident, Mother leveled delusional accusations that the neighbors were surveilling the family residence. Id. at 17. During a different episode on C.K.'s first birthday, Mother displayed suicidal ideations that required a three-day commitment at Millcreek Behavioral Health in Erie, Pennsylvania. Id. at 19, 55. She did not attend any aftercare and does not currently participate in therapy. Id. at 55.

In justifying the trial court's rejection of Father's concerns, the majority invokes Mother's testimony that Father was the source of her mental health problems and Mother's supposition that, now that she is not living with Father, her mental health will not impair her parenting ability. While the trial court apparently found Mother's testimony credible, as I outlined supra, the certified record does not sustain the trial court's credibility determination. Mother has documented mental health problems, and while it is possible that those issues might not encumber her parenting abilities, I believe the trial court abused its discretion in finding that this factor was either inapplicable or neutral. Under

§ 5328 (a)(4), (a)(10), and (a)(15), Mother's mental health problems militate in favor of awarding Father primary physical custody of C.K.

For all of the foregoing reasons, I find that the trial court erred in concluding that the custody factors outlined in § 5328(a)(1), (3), (8), (10) and (15) were neutral. In my view, these factors all militated, to varying degrees, in favor of awarding primary physical custody to Father. I also reject the trial court's implicit determination that the safety considerations under subsection (a)(3), which favored Father, were superseded by its finding under subsection (a)(12) that Mother has been the primary caretaker. In this regard, I observe that the record reveals that Father shared daily parenting duties until Mother removed C.K. from the family home and hid their location. Moreover, to the extent that the record supports the trial court's finding that Mother currently provides the majority of the daily caregiving, that consideration does not eclipse the "weighted consideration" that the trial court was required to give subsection (a)(3), as a factor that affects safety. See 23 Pa.C.S. § 5328(a); M.J.M., supra at 338.

Thus, I would vacate the custody order awarding the parties shared physical custody and remand for the trial court to enter an order that awards Father primary custody of C.K. and grants Mother periods of partial physical custody.